PKC/RAB:PT
F#2011R00714

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M 11-1015**

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

MICHAEL DARAGJATI,

        Defendant.

- - - - - - - - - - - - - - - - - - X

<u>FILED UNDER SEAL</u>

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANT
(T. 18, U.S.C., §§ 242,
1343 and 1951(a))

EASTERN DISTRICT OF NEW YORK, SS:

      RYAN STINSON, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, on or about and between
April 15, 2011 and April 17, 2011, within the Eastern District of
New York, the defendant MICHAEL DARAGJATI, together with others,
while acting under color of law, did knowingly and willfully
deprive John Doe #1 of (a) the right secured and protected by the
Constitution and laws of the United States to be secure in his
person and free from unreasonable search and seizure by one
acting under color of law and (b) the right secured and protected
by the Constitution and laws of the United States to be free from
unequal treatment on account of race by one acting under color of
law, by falsely and maliciously arresting and prosecuting John

Doe #1 on the charge of resisting arrest, knowing that there was no probable cause for such charge.

(Title 18, United States Code, Section 242)

Upon information and belief, in or about and between March 2011 and May 2011, within the Eastern District of New York, the defendant MICHAEL DARAGJATI, together with others, did knowingly and intentionally attempt and conspire to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, to wit: the attempted extortion from John Doe #2 of snowplow equipment and money.

(Title 18, United States Code, Section 1951(a))

Upon information and belief, there is probable cause to believe that in or about and between January 2011 and May 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL DARAGJATI did knowingly and intentionally devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing and attempting to execute such a scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds.

(Title 18, United States, Code, Section 1343)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I am a Special Agent with the FBI and have served in that capacity for approximately four years.  During that time, I have investigated numerous cases involving public corruption, civil rights violations and narcotics trafficking.  Prior to beginning my service with the FBI, I served for 14 years as a police officer and then sergeant in two municipalities in Pennsylvania.  During the course of my law enforcement career, I have conducted or participated in surveillance, witness interviews, undercover transactions, wiretaps, the execution of search warrants, debriefings of informants and reviews of taped conversations and financial records.  The information set forth in this affidavit is based upon my participation in witness interviews, my review of documentary evidence, records, grand jury transcripts and intercepted audio recordings, and my discussions with other law enforcement agents, including officers of the New York City Police Department ("NYPD") Internal Affairs Bureau ("IAB").  More specifically, I and fellow agents and IAB officers have interviewed, among others, John Doe #1, John

---

[1]  Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause to obtain a warrant for the arrest of the defendant, I have not described all of the relevant facts of which I am aware.

4

Doe #2 and several NYPD officers who witnessed the arrest of John Doe #1 by the defendant MICHAEL DARAGJATI.

2.   In this affidavit, I have described portions of certain conversations that were intercepted during the course of court-authorized wire surveillance or were consensually made by a party to the conversation.  I have not, however, summarized every pertinent intercepted call or consensually recorded conversation, nor have I included every pertinent part of the calls that I have summarized.  Moreover, any transcripts of recorded conversations are preliminary and in draft form.  As such, the summaries set forth in this affidavit are preliminary in nature.

3.   Unless otherwise indicated, identifications of individuals on the intercepted wire communications in this investigation were made through name and voice identifications made by the law enforcement agents monitoring the wire interceptions.  Agents initially identified each interceptee through the interceptee's identification of himself by name during the course of the conversation in conjunction with available subscriber information and other available information received in response to requests by law enforcement.  Thereafter, agents would identify the interceptee through either the use of the interceptee's name, or through voice identification based upon comparisons with prior interceptions of that individual.

### The Defendant

4.   The defendant MICHAEL DARAGJATI is a 32-year old caucasian male who stands about six feet, two inches tall.  Since 2003, DARAGJATI has been employed as a police officer by the NYPD.  From on or about March 22, 2006 until on or about July 1, 2011, DARAGJATI was assigned to the Staten Island anti-crime unit of the NYPD.  On or about July 1, 2011, DARAGJATI was reassigned to his current assignment, the Criminal Justice Bureau of the NYPD.  In that assignment, DARAGJATI handles prisoner paperwork and does not interact with the public or carry a firearm.

5.   The defendant MICHAEL DARAGJATI owns Essential Renovations ("Essential"), a construction and snow removal company.  In his off-duty hours, DARAGJATI does construction and snow removal work for Essential.

I.   **Violation of Civil Rights Under Color of Law**

### John Doe #1

6.   John Doe #1 is a 31-year old African-American male who stands about five feet, six inches tall.[2]

---

[2]   John Doe #1 has previously been convicted of various crimes, including possession of a forged instrument in the second degree and attempted robbery in the second degree.  On April 15, 2011, John Doe #1 was not on parole or otherwise under the supervision of any corrections agency.

**The Events of April 15, 2011 through April 17, 2011**

7.   On or about April 15, 2011, the defendant MICHAEL
DARAGJATI was assigned to patrol the Stapleton neighborhood of
Staten Island together with his longtime partner ("Partner").
DARAGJATI and his Partner were in plain clothes and an unmarked
NYPD vehicle.

8.   At approximately 9:30 p.m. that evening, the
defendant MICHAEL DARAGJATI and his Partner came across John
Doe #1, who was walking alone in the vicinity of the intersection
of Targee Street and Laurel Avenue in Staten Island.  DARAGJATI
and his Partner exited their unmarked NYPD vehicle, approached
John Doe #1, and told John Doe #1 to take his hands out of his
pockets and raise them.  Despite John Doe #1's compliance with
the requests, DARAGJATI forcibly pushed John Doe #1 against the
side of a parked van and roughly frisked him.  Upon frisking John
Doe #1, DARAGJATI determined that John Doe #1 was not in
possession of a firearm or other contraband.  While DARAGJATI
frisked John Doe #1, he and his Partner took John Doe #1's wallet
from his pocket and examined his driver's license.

9.   After the frisking, John Doe #1 engaged in a
verbal exchange with the defendant MICHAEL DARAGJATI, during
which John Doe #1, in part and substance, complained about his
treatment by DARAGJATI and asked for DARAGJATI's name and badge
number.  During this exchange, DARAGJATI let John Doe #1 walk

7

away and continue down the street. As John Doe #1 walked away, he continued to complain about his treatment by DARAGJATI, including shouting insults at DARAGJATI. At that point, DARAGJATI and his Partner crossed the street, re-approached John Doe #1, placed John Doe #1 under arrest and handcuffed him.

10. At the time of this incident, no one was on the street in the vicinity of the defendant MICHAEL DARAGJATI and John Doe #1 except for DARAGJATI's Partner and three other plainclothes NYPD officers from a different unit, who had arrived in the area by chance during DARAGJATI's verbal exchange with John Doe #1. The three plainclothes officers observed DARAGJATI and his Partner cross the street, re-approach John Doe #1 and place him under arrest. At no time, before or after DARAGJATI and his Partner approached John Doe #1 to arrest him, did John Doe #1 resist arrest in any way or attempt to escape.

11. The defendant MICHAEL DARAGJATI and his Partner took John Doe #1 to the NYPD's 120th Precinct station house in Staten Island for processing. En route, DARAGJATI and his Partner talked about contacting their sergeant to see what kind of charges to bring against John Doe #1. At the 120th Precinct Station House, DARAGJATI told John Doe #1, in part and substance, that John Doe #1 could have gone home that night, but that DARAGJATI really did not like being disrespected.

12. Late that evening, the defendant MICHAEL DARAGJATI wrote an arrest report charging John Doe #1 with the following offenses: resisting arrest, a misdemeanor under New York law; harassment in the second degree, a violation under New York law; and disorderly conduct, a violation under New York law.[3/]  In the arrest report, DARAGJATI falsely wrote that when DARAGJATI sought to arrest John Doe #1, John Doe #1 "did then push officer. Officer attempted to handcuff defendant, he did then kick and flail his arms in an attempt to prevent arresting officer from effecting a lawful arrest."  On the basis of DARAGJATI's arrest report, John Doe #1 was held in custody overnight at the 120th Precinct.

13. The following morning, on April 16, 2011, the defendant MICHAEL DARAGJATI swore out a criminal complaint which was filed in Richmond County Criminal Court.  The complaint charged John Doe #1 with resisting arrest (a misdemeanor) and disorderly conduct (a violation).  In the complaint, DARAGJATI affirmed that, among other things, John Doe #1 "did intentionally attempt to prevent [DARAGJATI] from effecting an authorized

---

[3/]    Under New York law, violations are not criminal offenses. Therefore, unlike people charged with felony or misdemeanor criminal offenses, people charged only with violations are not held in custody until they can appear before a judge who determines the conditions under which they may be released on bail; instead, the arresting officer issues a summons to a person charged with a violation, and the arrestee is released pending his or her scheduled court appearance as indicated in the summons.

arrest in that the defendant did flail his arms, kick his legs, and push off from [DARAGJATI]."

14.    John Doe #1's initial appearance in Richmond County Criminal Court did not occur until the next day, April 17, 2011.  John Doe #1 was thus held in custody for a second night at the 120th Precinct station house before he was brought to Richmond County Criminal Court on the morning of April 17, 2011. When John Doe #1's case was called, his counsel was advised by the District Attorney's Office that the misdemeanor resisting arrest charge would be dropped if John Doe #1 pleaded guilty to the disorderly conduct violation.  John Doe #1's counsel told him that if he did not accept this offer, he would continue to face the resisting arrest charge.  Believing that if he did not accept this offer, he would be unable to post bail on the resisting arrest charge and would be remanded to jail on Riker's Island for a period of days or weeks, John Doe #1 pleaded guilty to disorderly conduct and was released with a conditional discharge.

### Calls Intercepted The Night Of April 15, 2011

15.    On the night of April 15, 2011, the government intercepted a series of text messages and telephone calls between the defendant MICHAEL DARAGJATI and his NYPD supervisor, a Sergeant (the "Sergeant").  Based on my training, experience and discussions with IAB officers, as well as my interviews of the three NYPD officers who witnessed DARAGJATI's arrest of John

Doe #1, I believe that these text messages and calls show that DARAGJATI fabricated critical facts in his police report and complaint concerning the arrest of John Doe #1.

16.   In a text message sent by the defendant MICHAEL DARAGJATI to the Sergeant at about 10:05 p.m., DARAGJATI wrote "Resisting and gonna do more.  Perp in car, can't talk."

17.   During two subsequent telephone calls, the defendant MICHAEL DARAGJATI and the Sergeant discussed, in sum and substance, the consequences of charging John Doe #1 with disorderly conduct.  The Sergeant advised DARAGJATI, in substance, that such conduct could only be charged as a "C Summons," which would not result in John Doe #1 being held in custody that night.

18.   During the second subsequent telephone call, the defendant MICHAEL DARAGJATI made several false statements to the Sergeant, including (1) that the other NYPD officers who arrived on the scene had said that John Doe #1 should be arrested, (2) that John Doe #1 had "pulled his hand back" and started "pushing off" when DARAGJATI tried to arrest him, and that John Doe #1 then started "wrestling," (3) that it took four NYPD officers to subdue and handcuff John Doe #1 and (4) that many residents in the area had "com[e] out of their windows" to observe John Doe #1's arrest.  During this same conversation, DARAGJATI also admitted, in substance (1) that he had not found

any contraband on John Doe #1, (2) that when arresting John Doe #1, DARAGJATI had "fucking grabbed [John Doe #1] by his neck and...put his face on the trunk of the car," and (3) that DARAGJATI "definitely want[ed] to put [John Doe #1] the fuck in," meaning in custody.

19.   In another telephone call a few minutes later, the defendant MICHAEL DARAGJATI again falsely told the Sergeant that John Doe #1 "pushed off me," and that 12 to 13 people had come to watch the dispute.  When the Sergeant asked if John Doe #1 could be charged with the felony of second degree assault on a police officer, however, DARAGJATI demurred, but then stated again, falsely, that John Doe #1 "was wrestling, but that's not beating me up, you know..."

### Defendant's Malicious Intent

20.   At or about 12:16 p.m. on April 16, 2011, the government intercepted a telephone call between the defendant MICHAEL DARAGJATI ("MD") and a female friend ("F1").  Soon after the call began, they had the following exchange:

> F1:  What are you doing?  Working?
>
> MD:  I'm fuckin, just got out of court right now.
>
> F1:  Are you serious?
>
> MD:  Yeah, I got there at like 10 o'clock, and I was like fuckin, I sat there for a couple of hours by the time I got it all done but, fried another nigger.
>
> F1:  What?

MD:   Another nigger fried, no big deal.

F1:   [Laughter]

21.   During the course of the government's interception of calls made to and from the defendant MICHAEL DARAGJATI's cellular telephone, on at least twelve other occasions, DARAGJATI used the term "nigger" to pejoratively refer to African-Americans.  For example, on March 31, 2011 at or about 2:35 p.m., DARAGJATI (while in the New York area) engaged in a telephone call with a relative (the "Relative" or "R")) in Florida whom DARAGJATI was scheduled to soon visit.  After DARAGJATI expressed concern about a weather forecast he had recently heard predicting tornadoes in Florida, the Relative responded that tornadoes were unlikely and the following exchange occurred:

R:    ...I mean I see this big funnel cloud headed towards me.  Shit's being sucked into it, but I don't think that's a tornado.

MD:   No, no, that's like a fuckin', what that is, that shit's a vacuum for the niggers.

R:    (Laughter)

MD:   They're sending them to the fucking, what they do is they spit them around and they relocate them like seeds.

22.   On April 30, 2011, at or about 4:59 p.m., the defendant MICHAEL DARAGJATI spoke on the telephone with a male friend (Friend #2).  During this telephone call, Friend #2 asked DARAGJATI if he had a truck that Friend #2 could use to transport another friend's motorcycle.  DARAGJATI asked Friend #2 why he

couldn't load the motorcycle on the back of Friend #2's pickup truck.   Friend #2 responded that the bed of the pickup truck was too high off the ground, and asked how he would get the motorcycle up that high.   DARAGJATI responded that Friend #2 should "pile some niggers up and drive it over them."

      23.   The government has also intercepted telephone calls in which the defendant MICHAEL DARAGJATI admits that he is concerned he will be caught committing wrongdoing that would end his NYPD career.   On May 10, 2011 at or about 9:59 a.m., DARAGJATI was recorded speaking to a friend ("F3") about how he (DARAGJATI) had invested too heavily in houses he was renovating through his construction business, and his concerns about losing his NYPD salary:

> MD:   ... My disease is my houses, every dollar I
> make I dump in my houses.  Because...
>
> F3:   Yeah, yeah yeah.
>
> MD:   You know, anything could happen, that's [UI]
> Like the cop, I could get fired tomorrow, bro
> you know how it goes, I could throw somebody
> a beating, they catch me on camera, and I'm
> fired.
>
> F3:   Yeah yeah [UI]
>
> MD:   Exactly, that's what I said, you ain't gonna
> see me stockin fuckin shelves in Costco.

      24.   On May 25, 2011, at or about 8:18 p.m., the government intercepted a call between the defendant MICHAEL DARAGJATI and a friend ("Friend #4" or "F4").   During this call,

DARAGJATI discussed his work buying and renovating houses.  He also told Friend #4 that he did not want to work for the NYPD forever, because he was likely to get in trouble if he did:

> F4: How long are you going to keep this up, how many houses are you going to buy?
>
> MD: To be honest [Friend #4], I don't know if I want to be a cop forever, so.
>
> F4: Right.
>
> MD: Your dad used to say, I remember your dad keeps saying it to me, and my dad said it to me, why I am wasting my time as a cop.  I'm doing it for now, but - you know, the people we know, the fuckin things that we - it's so easy for us to get in trouble all the time.
>
> F4: Yeah.
>
> MD: And I've been skating it for a long time.

II.  **Extortion by Threat and Physical Violence**

25.  On March 2, 2011, the defendant MICHAEL DARAGJATI engaged in a recorded telephone call with a confidential source (the "CS").  During this call, DARAGJATI informed the CS that someone had stolen a piece of snowplow equipment from an area near DARAGJATI's Staten Island residence, saying "they hooked it up and stole my whole Western plow."[4]  Later during the same call, DARAGJATI stated "I'm gonna fuckin' kill somebody bro, I gotta go to the cops now and see if anyone has cameras on the

---

[4]  "Western" is a brand of snowplow equipment.  The company that manufactures Western snowplows is headquartered in Milwaukee, Wisconsin, and all Western snowplows are manufactured outside the state of New York.

block." DARAGJATI also said "I want to know who did it, I'm not going to handle it the cop way."

26. On March 3, 2011, during a consensually recorded telephone call with the CS, the defendant MICHAEL DARAGJATI asked if the CS knew John Doe #2, identifying him by name. When the CS replied that he knew John Doe #2, DARAGJATI asked the CS if he knew John Doe #2 well enough to save his life, because John Doe #2 had stolen DARAGJATI's plow.

27. Later on March 3, 2011, the CS engaged in a consensually recorded meeting with the defendant MICHAEL DARAGJATI. During this meeting, DARAGJATI said that he had identified the person who had stolen his plow, so "the kid [John Doe #2, the alleged plow thief] is going to get it," and "gonna get broken really bad, bad, bad." DARAGJATI told the CS that John Doe #2 has an "appointment" with people the next morning, but that DARAGJATI could call off the meeting if John Doe #2 returned the snowplow. DARAGJATI said that John Doe #2 was going to meet "us" early the next morning, "but he thinks he's going to something else." When the CS stated that John Doe #2 could get "clipped" if he steals the wrong plow, DARAGJATI replied that John Doe #2 was "going to get a taste tomorrow morning." During the meeting, DARAGJATI named John Doe #2's employer. The CS claimed to know the employer and offered to approach the employer to attempt to get the plow back. DARAGJATI responded that a

friend of his was going to "take care of it from the Albanian point of view,"[5] because DARAGJATI was not doing this as a cop, saying "this is my shit."

28.  Still later on March 3, 2011, during another consensually recorded telephone call with the CS, the defendant MICHAEL DARAGJATI told the CS that the meeting with John Doe #2 the next day would be just a "verbal" meeting.

29.  During the morning of March 4, 2011, John Doe #2 was lured to a parking lot in Staten Island after he received a telephone call from a woman who said she wanted to meet to discuss snow removal work that she needed done.  Once John Doe #2 arrived at the parking lot, approximately eight caucasian males pulled him out of his car.[6]  At least one of these men punched him, and one of them threatened him with a handgun.  One of the men told John Doe #2 that they knew he had stolen a snowplow from the neighborhood in Staten Island where the defendant MICHAEL DARAGJATI lived, and that he had to either return the snowplow to its owner or pay $5,000.

30.  Later on March 4, 2011, the CS unexpectedly saw the defendant MICHAEL DARAGJATI at a restaurant on Staten Island,

---

[5]  DARAGJATI is of Albanian-American heritage.

[6]  At a later date, John Doe #2 was shown a photo array that included DARAGJATI's photograph.  John Doe #2 did not identify DARAGJATI, or anyone else in the photo array, as one of his assailants in the parking lot.

together with a man whom the CS identified (Co-conspirator #1) and two other men. DARAGJATI informed the CS that they had beaten John Doe #2 earlier that morning. DARAGJATI then showed the CS a digital photograph saved on DARAGJATI's cellular telephone depicting John Doe #2 after he had been beaten, including visible injuries.

31. Later on March 4, 2011, the CS and the defendant MICHAEL DARAGJATI engaged in a consensually recorded telephone call. The CS told DARAGJATI that John Doe #2's employer had said that John Doe #2 did not know what plow was at issue. DARAGJATI responded that "My friend [Co-conspirator #1] kept saying that, he [referring to John Doe #2] definitely didn't soak it in his head because he kept saying that three times." When the CS asked if DARAGJATI was sure John Doe #2 had stolen the plow, DARAGJATI replied that John Doe #2 had taken it, because John Doe #2 had repeatedly asked DARAGJATI where the plow had been stolen from:

> MD: Yeah he took it because [CS], he kept asking me the location.
>
> CS: He did?
>
> MD: Yes
>
> CS: He kept asking you where it...
>
> MD: The location, he didn't say "I don't know what you're talking about," which they always say anyway.
>
> CS: Right.
>
> MD: "What's the location, what's the location?"

and when I gave him the location he stopped for a second. I said I don't care where you get it [the plow] from.

32. Later on March 4, 2011, the CS and the defendant MICHAEL DARAGJATI engaged in a consensually recorded meeting. During the meeting, DARAGJATI asked the CS if he thought John Doe #2 "is going to come through with the plow, or do we have to go to Plan B on his ass?" Later during the conversation, the CS asked DARAGJATI if he thought that John Doe #2 would return the plow, and DARAGJATI responded by describing the beating inflicted on John Doe #2 earlier that morning: "Dude, crying, crying he climbed under the truck, we had to pull his legs out."

33. On March 7, 2011, the CS and the defendant MICHAEL DARAGJATI engaged in a consensually recorded telephone call. DARAGJATI told the CS that a friend had told DARAGJATI that John Doe #2 was planning to either return the plow to DARAGJATI or give him more than $5,000 in restitution. Later during the conversation, DARAGJATI described John Doe #2 as a "nobody" who was not associated with anyone of influence, and that he had cried like a "bitch" when he was beaten.

34. Later on March 7, 2011, the CS and the defendant MICHAEL DARAGJATI engaged in another consensually recorded telephone call. During this call, DARAGJATI said what he would do if the Richmond County District Attorney's office did not prosecute John Doe #2:

> MD: I'll be damned if I let this kid walk. So
> that's why I'm, yo, maybe he'll walk from the
> fucking district attorney, but you ain't
> gonna be able to walk on your own, ha ha,
> you're gonna walk with a walker.

35. On March 15, 2011, the CS and the defendant
MICHAEL DARAGJATI engaged in a consensually recorded telephone
call. During this call DARAGJATI told the CS, in sum and
substance, that the plow had actually been stolen by John Doe #3,
not John Doe #2. DARAGJATI further stated that we are gonna get
to know him [John Doe #3] real good soon too. The fact that John
Doe #3 and not John Doe #2 had stolen the plow did not bother
DARAGJATI, because be believed that John Doe #3 was part of John
Doe #2's "crew." DARAGJATI also told the CS that John Doe #3 had
unsuccessfully tried to sell the plow on Amboy Road in Staten
Island, and sold it in Pennsylvania instead.

36. On April 5, 2011, the CS and the defendant MICHAEL
DARAGJATI engaged in a consensually recorded telephone call.
During a discussion about John Doe #2, DARAGJATI stated that his
brother was not "letting it go" because "this kid is stealing our
shit," meaning that DARAGJATI and his brother believed that John
Doe #2 had not been sufficiently punished for stealing the plow.
DARAGJATI emphasized that the matter could not be dropped, or
else John Doe #2 could say "oh they threw me a beating," and that
was worth the $5,000 John Doe #2 presumably made by selling the
stolen plow. DARAGJATI said that John Doe #2 needed to be

"looking over his shoulder because he doesn't know where it's coming from."

37.   On May 19, 2011, the CS and the defendant MICHAEL DARAGJATI engaged in a consensually recorded meeting.   During this meeting DARAGJATI told the CS, in sum and substance, that he had learned federal agents were investigating the March 4, 2011 beating of John Doe #2.   DARAGJATI stated:

> MD:   If something happens, these guys are dead.
> If I lose my fuckin job that I work hard for
> a living, these guys because he caught a
> beating...

DARAGJATI also said, in sum and substance, that he had collected about $5,000 from his insurance company to cover the loss of his stolen snowplow.   Therefore, DARAGJATI was worried that if he tried to collect more money from John Doe #2, "that could be a whole other case for me," because he was "extorting [John Doe #2] for money even though [DARAGJATI] got paid from the insurance. So I've got to lay that back, but still, fucking this kid still has it coming to him, for other ways."

III. **Wire Fraud**

38.   In or about and between January 2011 and February 2011, the defendant MICHAEL DARAGJATI and the CS discussed how to file an insurance claim to cover damage to some light poles in a parking lot.   The CS had caused this damage while operating a vehicle owned by DARAGJATI or Essential during the course of an Essential snow removal job.   DARAGJATI told the CS, in sum and

substance, that he would not be able to use his own insurance carrier to make a claim for the damage to the light poles, because he [DARAGJATI] did not have commercial insurance coverage.  Instead, DARAGJATI wanted the CS, who owned his own construction company, to falsely state that the CS had caused the damage while operating one of his own vehicles and make a claim for the damage on the CS's own commercial insurance policy. DARAGJATI also wanted the CS to falsely claim to his commercial insurer (the "Insurer") that the CS had also damaged a pickup truck which belonged to DARAGJATI.  DARAGJATI and the CS would purposefully damage DARAGJATI's pickup truck in order to support the claim.

39.  On January 24, 2011, the defendant MICHAEL DARAGJATI and the CS engaged in a consensually recorded telephone call.  During this call, DARAGJATI told the CS, in sum and substance, to tell the Insurer that the CS had backed snow removal equipment into the light pole during a snowstorm and it had fallen down.  DARAGJATI further instructed the CS, in sum and substance, to give the Insurer DARAGJATI's contact information, and to falsely tell the Insurer that DARAGJATI worked for the company that owns the parking lot where the broken light pole was located.

40.  On March 2, 2011, the defendant MICHAEL DARAGJATI and the CS engaged in a consensually recorded telephone call.

During this call, DARAGJATI and the CS agreed that the CS would
pick up DARAGJATI's pickup truck later that afternoon.  DARAGJATI
discussed the damage that he wanted the CS to purposefully
inflict upon DARAGJATI's truck.  Explaining that he wanted the
truck to be driveable after the CS inflicted the damage,
DARAGJATI said "but next week, if snow comes down, next week, I
don't care what it looks like, I just drive it, you know."  When
the CS stated that he would inflict damage all along the
passenger side of the truck, DARAGJATI responded, "[s]o it's
still driveable, that's fine."

41.   On or about the evening of March 3, 2011, the CS,
acting on the previous instructions of the defendant MICHAEL
DARAGJATI, repeatedly rammed a box truck[2/] into to the body of
DARAGJATI's truck, causing extensive damage to DARAGJATI's truck.

42.   Later on March 3, 2011, the defendant MICHAEL
DARAGJATI and the CS engaged in a consensually recorded telephone
conversation.  During this call, the CS informed DARAGJATI that
he "took care of [DARAGJATI's] truck, the door, the back, fender,
everything."  When the CS told DARAGJATI that he needed the
paperwork for the insurance claim, DARAGJATI replied that "it's
done already."

_____

[2/]   A "box truck" is a type of truck with a cab in the front and
a separate cargo "box" attached behind the cab.

43.   Still later on March 3, 2011, the defendant
MICHAEL DARAGJATI and the CS engaged in another consensually
recorded telephone call.  The CS asked DARAGJATI when he would
provide the CS with an estimate of the damage to the CS's truck,
so the CS could provide it to the Insurer.  DARAGJATI replied, in
sum and substance, that his wife was preparing the estimate.

44.   On March 5, 2011, the defendant MICHAEL DARAGJATI
and the CS engaged in a consensually recorded telephone call.
During this call, DARAGJATI asked the CS, in sum and substance,
what equipment the CS had used to back into DARAGJATI's truck to
cause the damage.  DARAGJATI further stated, in sum and
substance, that he was concerned that "it looked like something
might have bumped into [the truck] a few different times," which
could lead the Insurer to question the claim.

45.   On or about March 13, 2011, the defendant MICHAEL
DARAGJATI gave the CS an estimate for the cost of repairing the
damage to DARAGJATI's truck.  The estimate stated that the
repairs would cost more than $15,100 for parts and materials, and
more than $5,800 for labor.

46.   On April 18, 2011, a female FBI agent acting in an
undercover capacity and pretending to be an employee of the
Insurer ("UC #1") placed a telephone call to the defendant
MICHAEL DARAGJATI.  During this recorded telephone call,
DARAGJATI told UC #1, in sum and substance, that something

happened to the truck at a time when DARAGJATI was not in the truck, and DARAGJATI just saw the damage afterwards.

47. On April 20, 2011, a second female FBI agent acting in an undercover capacity and pretending to be an employee of the Insurer ("UC #2") placed a recorded telephone call to the defendant MICHAEL DARAGJATI. During this call, DARAGJATI told UC #2, in sum and substance, that his truck was damaged while it was parked in a Staten Island parking lot during a snowstorm. DARAGJATI further stated, in sum and substance, that he was told that something slid into his truck, and that he didn't know other details but that the other driver was insured. DARAGJATI also said, in sum and substance, that he did not know the name of the driver who hit his truck, he just knew the name of the driver's company. DARAGJATI identified himself, in sum and substance, as the manager of the complex attached to the parking lot where his truck had been parked when it was damaged. During this call, UC #2 told DARAGJATI that to advance his claim he needed to provide the Insurer with two more repair estimates from auto body shops, in addition to the estimate that DARAGJATI had already given the CS.

48. Later on April 20, 2011, the defendant MICHAEL DARAGJATI and the CS engaged in a consensually recorded telephone call. During this call, DARAGJATI told the CS that while talking

on the phone with UC #2, DARAGJATI "just played dumb with the lady" when answering her questions.

49. On or about April 26, 2011, the defendant MICHAEL DARAGJATI sent by facsimile an estimate listing the cost to repair the damage to his truck. DARAGJATI sent the facsimile to a telephone number that DARAGJATI believed belonged to the Insurer but had in fact been set up by law enforcement. DARAGJATI sent this estimate from a telephone number with a 718 area code, which law enforcement has identified as used by Essential. DARAGJATI operates Essential from his residence in Staten Island. Law enforcement received this facsimile in New Jersey.

50. On or about May 5, 2011, the defendant MICHAEL DARAGJATI sent by facsimile another estimate calculating the cost to repair the damage to his truck. DARAGJATI sent the facsimile to the same New Jersey location on April 26, using the number that DARAGJATI believed belonged to the Insurer but had in fact been set up by law enforcement. DARAGJATI sent this estimate by facsimile from the same telephone number with a 718 area code he had used to send the April 26 facsimile. With this estimate, DARAGJATI also sent a facsimile cover sheet that listed the telephone number from which he sent the facsimile as a telephone number to which facsimiles intended for Essential should be sent.

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of the defendant MICHAEL DARAGJATI, so that he may be dealt with according to law.  Your deponent further requests that this Affidavit and the arrest warrant be filed under seal until further order of the Court to prevent the flight of the target, destruction of evidence and tampering with witnesses.

RYAN STINSON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
13th day of October, 2011

S/ Reyes

THE H(                           JR.
UNITE                          JUDGE
EASTE                          ORK